# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HREF SENIOR WORTHINGTON LLC and SL1 B LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-1148-MTZ |
| CONROE WM LLC and WM PROPERTY HOLDINGS LLC, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| WM CONROE PROPERTY HOLDINGS LLC, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 31, 2025
Date Decided: January 12, 2026

J. Clayton Athey, John G. Day, Stacey A. Greenspan, Kirsten M. Valania, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Rebecca Woods, SEYFARTH SHAW LLP, Atlanta, Georgia, *Attorneys for Plaintiffs HREF Senior Worthington LLC and SL1 B LLC.*

Kevin J. Mangan, Stephanie S. Riley, Zachary Murphy, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware, *Attorneys for Defendants Conroe WM LLC and WM Property Holdings LLC.*

**ZURN, Vice Chancellor.**

This post-trial opinion identifies the manager of a holding company, which holds an operating company, which owns and operates an assisted living facility. The plaintiff, an institutional lender in the commercial residential space, lent the holding company necessary capital secured by the right to step in as manager if the holding company failed to make timely payments. The lender's right to become the holding company's manager upon nonpayment was undisputedly triggered.

But the team that built the facility does not want to give up control to the lender. The defendants contend agreements between the operating company and its mortgage insurer impose approval requirements to change the holding company's manager that have not been fulfilled.

This opinion concludes the lender is the holding company's manager. The approval requirements the defendants invoke do not apply to the holding company, the contract giving rise to the lender's step-in rights is not illegal, and this Court can resolve the control dispute with the parties before it.

## I. BACKGROUND[1]

The following facts were either uncontested in this summary proceeding, or were proven by a preponderance of the evidence. Trial was held on a paper record, including the parties' joint exhibits and the stipulated facts in the parties' Joint Pre-Trial Order.[2]

### A. The Project Is Funded With A HUD-Insured Loan.

At least by 2019, Curtis Lindsey owned some undeveloped land in Conroe, Texas, and had a plan to build a 117-bed assisted living facility on that land (the "Project").[3] Defendant Conroe WM LLC ("OpCo") is a Delaware limited liability company formed "to acquire, develop and operate" the Project.[4]

---

[1] Citations in the form "AC ¶ __" refer to the Amended Verified Complaint, available at docket item ("D.I.") 18. Citations in the form "Ans. ¶ __" refer to the defendants' answer to the Amended Verified Complaint, available at D.I. 27. Citations in the form "DOB __" refer to the defendants' corrected opening pre-trial brief, available at D.I. 74. Citations in the form "PB __" refer to the plaintiff's corrected pre-trial brief, available at D.I. 72. Citations in the form "RB __" refer to the defendants' corrected reply brief, available at D.I. 75. Citations in the form "PSR __" refer to the plaintiff's sur-reply brief, available at D.I. 66. Citations in the form of "Trial Tr. __" refer to the trial transcript, available at D.I. 79. Citations in the form "JX __" refer to the parties' joint exhibits.

[2] D.I. 77 [hereinafter "Joint Stip."].

[3] JX 14 at 55-70; JX 4 at 3, 25, 113; Trial Tr. 10.

[4] JX 14 at Recital A [hereinafter the "Master Agreement"].

The Project was primarily financed with a loan from Greystone Funding Company LLC ("Greystone" or "Lender") to OpCo (the "Loan").[5] All the relevant financing documents defined OpCo as the "Borrower" on the Loan.[6]

The Loan had to be insured by the U.S. Department of Housing and Urban Development ("HUD"), through its Section 232 loan program.[7] That program provides mortgage insurance for residential care facilities, including the new construction of assisted living facilities.

When HUD agreed to insure the loan, it imposed certain conditions on OpCo.[8] HUD required OpCo to designate a specific individual to be an owner, member, and co-manager with operational and day-to-day control over "the Borrower's entity."[9] To start, that person was Lisa Ann Shelton.[10] HUD required Shelton's role to be documented in OpCo's organizational documents.[11] HUD also required a consent right over removing Shelton from those roles, as set forth in HUD's letter agreeing to insure the loan:

---

[5] JX 4 at 175; Joint Stip. ¶ 16.

[6] *See, e.g.*, JX 4 at 175 ("We understand that [Greystone], as Lender, ha[s] agreed to make a loan to Conroe WM LLC (hereinafter called the 'Borrower')"); JX 3 (identifying OpCo as the borrower).

[7] JX 2 at 4; JX 4 at 175; Joint Stip. ¶ 16.

[8] JX 4 at 175–186.

[9] *Id*. §§ 7–7(c).

[10] *Id*. § 7. In the trial record, Shelton's first name is sometimes spelled "LisaAnn" and other times "Lisa Ann." I apologize if I have spelled it incorrectly.

4

7) . . . Prior to closing, the Borrower's Organizational Documents must be amended to address the below provisions and be satisfactory to HUD:

a) Clearly delineate her co-manager's roles and responsibilities and provide sufficient operational control to allow her to direct day-to-day operations at the facility including the sole right to manage the operations, including hiring all of the employees and operating the facility;

b) Give Ms. Shelton the deciding vote between the two co-managers; and,

c) ***Provide that Ms. Shelton cannot be removed from her co-manager role without HUD and Greystone Funding's explicit written approval***.

8) Borrower Structure: LisaAnn Shelton, the member and co-manager of the Borrower entity, is being relied upon to provide the relevant residential health care experience in the lease-up and operations of the proposed facility. ***As a result, the Borrower Regulatory Agreement shall be amended to state that prior HUD notification and approval is required before it is removed as a participant, or as the co-manager of the borrower entity***.[12]

As for Greystone, HUD required Greystone to collect three separate escrows for working capital, minor moveable equipment, and an initial operating deficit.[13]

**B. HREF Joins The Deal.**

In May 2019, plaintiff HREF Senior Worthington LLC ("HREF" or "Plaintiff")[14] was brought in to fund the HUD-required escrows.[15] On June 26,

---

[11] *Id*. §§ 7–8.

[12] *Id*. (emphasis added).

[13] *Id*. §§ 6–6(e).

HREF provided its letter of intent ("LOI") and its corresponding term sheet to fund HUD's escrow requirements.[16]

The LOI outlined the pertinent terms of HREF's investment. HREF's investment would be redeemed in full 42 months from closing; HREF would receive monthly payments until its investment was redeemed; and upon the occurrence of an "Additional Rights Event," HREF "may (i) remove the Sponsor from the day-to-day management of the Project[.]"[17] The LOI explained that in addition to funding the HUD-required escrows, a portion of HREF's capital would fund HREF's monthly payments, and "[s]uch amount shall be deposited into an account that can only be used for the designated purpose and be drawn with the consent of [HREF]."[18]

On July 18, Greystone shared with HREF HUD's firm commitment to insure the Loan.[19]

---

[14] Plaintiff operated as MidHudson Health Worthington LLC until early 2023 when its name was changed to MidHudson Real Estate Finance LLC. I understand references in the record to MidHudson Health Worthington LLC or MH refer to Plaintiff.

[15] Joint Stip. ¶¶ 1, 29; JX 1.

[16] JX 2.

[17] *Id*. at 4–6. The LOI noted that "[HREF] is a passive investor with no authority except in the event of fraud, bankruptcy, breach of project contracts or failure to pay the preferred return." *Id*. at 13.

[18] *Id*. at 6.

[19] JX 4 at 1, 175.

**C. The Project's Corporate Structure Is Papered.**

Several agreements supporting the Project were signed on December 1, 2019.[20] They memorialized HUD's consent right over changing OpCo's management, and show HREF's capital contributions were foundational to getting the Project going.[21]

### 1. The OpCo Agreement

OpCo adopted its Limited Liability Company Agreement for Conroe WM LLC (the "OpCo Agreement").[22] OpCo's two initial members were nominal defendant WM Conroe Property Holdings LLC ("HoldCo"), and Lindsey's entity Conroe Senior Living, LLC ("LindseyCo").[23] OpCo is a manager-managed LLC, and HoldCo is its manager.[24]

The OpCo Agreement includes specific "HUD Provisions" applicable while the HUD-insured Loan is outstanding.[25] Those HUD Provisions bake in HUD's consent right over removing the HUD contact from OpCo's management.

> (a) *Conflicts with the Loan Documents.* If any of the provision of the Company's Certificate of Formation, this Agreement or any other

---

[20] JX 5 [hereinafter "OpCo Agreement"]; JX 6 [hereinafter "HoldCo Agreement"].

[21] OpCo Agreement §§ 14.6(a)–(b)(vi); HoldCo Agreement § 5.1; HoldCo Agreement at Ex. B.

[22] Joint Stip. ¶ 13; *see generally* OpCo Agreement.

[23] OpCo Agreement at Recital; *id.* at Ex. A.

[24] *Id.* §§ 14.1(a)–(b).

[25] *Id.* §§ 14.6–14.6(i).

organizational document of the Company conflicts with the provisions of any of the Loan Documents, the provisions of the Loan Documents shall control.[26]

(b) *Restrictions on Amendments.* No provision required by HUD to be inserted in this Agreement or any other organizational document of the Company may be amended without the prior written approval of HUD. No provision of this Agreement or any other organizational document of the Company that results in any of the following will have any force or effect without the prior written approval of HUD:

. . .

(iv) Any amendment that would authorize any member, partner, owner, officer, manager, director, and/or any other person, other than one previously approved by HUD, to bind the Company for all matters concerning the Project that require the consent or approval of HUD . . . .[27]

The OpCo Agreement provides when OpCo would fund HoldCo's monthly payments to HREF.[28]

From time-to-time and before any distribution of Net Cash Flow pursuant to Section 9.2, the Company shall make payments to, or on behalf of, [HoldCo] sufficient to allow [HoldCo] to timely make required payments to [HREF] pursuant to the terms of the [HoldCo Agreement], including monthly payments of the [HREF] Current Return and all outstanding payments owed on the Anticipated Redemption Date.[29]

---

[26] *Id.* § 14.6(a).

[27] *Id.* §§ 14.6(b), 14.6(b)(iv).

[28] *Id.* § 9.1.

[29] *Id.* § 9.1.

And the OpCo Agreement builds HoldCo's redemption of HREF into OpCo's liquidation waterfall in the event of a sale.[30]

## 2. The HoldCo Agreement

HoldCo adopted its Limited Liability Company Agreement for WM Conroe Property Holdings LLC (the "HoldCo Agreement").[31] HoldCo's stated purpose "is to be the manager of [OpCo] and cause [OpCo] to be operated in accordance with the [OpCo Agreement]."[32]

HoldCo's initial members were defendant WM Property Holdings LLC ("WMPH," and with OpCo the "Defendants"), plaintiff SL1 B LLC, ("SL1")[33] and nonparty Shelton-Conroe, LLC ("Shelton-Conroe").[34] OpCo's designated HUD contact Lisa Ann Shelton was Shelton-Conroe's majority member.[35]

---

[30] *Id.* §§ 9.3–9.3(e).

[31] JX 6 [hereinafter "HoldCo Agreement"].

[32] HoldCo Agreement, Art. 4.

[33] SLI is a plaintiff in this plenary action, but only HREF brings Count V under 6 *Del. C.* § 18-110.

[34] Joint Stip. ¶ 15; HoldCo Agreement at Recital; *id*. at Ex. A.

[35] OpCo Agreement § 14.6(f) ("The key principals of the Company identified in Section 38 of the Regulatory Agreement are liable in their individual capacities to HUD as set forth in the Regulatory Agreement."); JX 9 [hereinafter "Borrower Agreement"] at Section 38 Addendum (identifying Shelton along with Norma Upshur and SL1); HoldCo Agreement §§ 14.1(b).

9

The HoldCo Agreement provides HREF would become a HoldCo member upon execution of an attached addendum (the "HREF Addendum").[36] The HoldCo Agreement also states that "the terms of the [HREF] Addendum shall control over any conflicting terms or inconsistencies with th[e] [HoldCo] Agreement."[37]

HoldCo is also a manager-managed LLC, with management decisions subject to overlapping consent rights.[38] The HoldCo Agreement named WMPH and Shelton-Conroe as "initial Managers."[39] In the event of a managerial deadlock, WMPH's decision "shall be binding unless the other [co-manager] . . . has received prior written consent or approval of SL1," in which case SL1's prior written approval controls.[40] The HoldCo Agreement specified that "while Shelton[-Conroe] is a Manager . . . Shelton[-Conroe] shall have the authority to take any act or make any decision . . . with respect to resident care and all other decisions regarding day-to-day management and operation of the Project."[41]

As for manager removal, the HoldCo Agreement provides "[a] Manager may be removed only for its failure to enforce the contractual rights of the Company under the terms of and conditions of the Development Agreement, the

---

[36] HoldCo Agreement § 5.1.

[37] *Id*.

[38] *Id*. §§ 14.1(a)–14.1(d).

[39] *Id*. § 14.1(d).

[40] *Id*. § 14.1(b).

Management Agreement or its other legally enforceable agreements, or for cause."[42]

The HoldCo Agreement requires any amendments to the HoldCo Agreement to be in writing and approved by all the Members.[43]

### D. HUD's Insurance Is Papered.

On February 1, 2020, OpCo and HUD executed the Healthcare Facility Note (the "Note"),[44] Healthcare Regulatory Agreement–Borrower Agreement (the "Borrower Agreement"),[45] and the Healthcare Regulatory Agreement–Operator Agreement (the "Operator Agreement")[46] (collectively, the "HUD Documents"). The HUD Documents are agreements among OpCo as the borrower, Greystone as the Lender, and HUD as the Loan insurer.[47] HoldCo is not a party to the HUD Documents.

The Note between OpCo and Greystone governs OpCo's payment obligations to Greystone.[48] The Note echoes HUD's approval to insure

---

[41] *Id.*

[42] *Id.* § 14.1(d).

[43] HoldCo Agreement § 20.12.

[44] JX 8 [hereinafter "Note"].

[45] Borrower Agreement.

[46] JX 10 [hereinafter "Operator Agreement"].

[47] Note at 1; Borrower Agreement at 1; Operator Agreement at 1; *see* JX 4 at 175 (defining OpCo as "Borrower" in HUD's "Firm Commitment" to insure the Loan).

[48] *See generally* Note.

Greystone's Loan to OpCo.[49]  The Note also includes a forum selection clause sending actions "arising under" the Note to Texas or federal court.[50]

The Borrower Agreement between OpCo, as borrower, and HUD requires HUD's prior written approval before Shelton can be removed from "the Borrower's organizational structure[.]"[51]  The Borrower Agreement recites that Shelton-Conroe was a member and co-manager of HoldCo, OpCo's sole manager.[52]  And it recites that Shelton was Shelton-Conroe's "sole member."[53]  Against that backdrop, the Borrower Agreement provides HUD must provide prior written approval before "any change in [OpCo's] organizational structure" that would result in Shelton's removal as Shelton-Conroe's manager.

> (b) HUD NOTIFICATION AND APPROVAL FOR REMOVAL OF LISAANN SHELTON. LisaAnn Shelton is the sole member of Shelton-Conroe, LLC, an Oregon member managed limited liability company ("Shelton"). Shelton is a member and co-manager of [HoldCo], the sole manager of [OpCo].  It is understood an[d] agreed by the Borrower and HUD that LisaAnn Shelton is being relied upon to provide the relevant residential health care experience in the lease-up and operations of the proposed facility. Therefore, while any mortgage is insured or held by HUD, Borrower acknowledges and agrees that it *must notify HUD and HUD must approve in advance and in writing any change in the Borrower's organizational structure that would result in any of the following*:

---

[49] *Id*. at 10.

[50] *Id*. §§ 16(a)–(b).

[51] Borrower Agreement § 46(b).

[52] *Id*.

[53] *Id*.

a) LisaAnn Shelton no longer being a participant in the Borrower or

b) *Shelton[-Conroe] no longer being the co-manager of the Borrower's manager* or

c) LisaAnn Shelton no longer being the sole member of Shelton[-Conroe].[54]

The Borrower Agreement also requires OpCo to secure HUD's approval before amending its organizational documents in a way that would remove Shelton from those positions.[55]  The Borrower Agreement provides:

34. Borrower shall not without the prior written approval of HUD, including without limitation in accordance with Program Obligations:

. . .

(i) Amend the organizational documents of Borrower in such a way that modifies the terms of the organizational documents required by HUD, Lender, and/or Program Obligations, including, but not limited to:

. . .

(iii) any amendment that would change the identity of the persons and/or entities authorized to bind Borrower previously approved by HUD or pre-approve a successor general partner, manager or member to bind the partnership or company for any matters concerning the Project which require HUD's consent or approval;

(iv) a change in any general partner, manager or managing member or pre-approved successor general partner, manager or managing member of the partnership or company or any change in a guarantor of any obligation to HUD; and

---

[54] *Id*. (emphasis added).

[55] *Id*. § 34(i).

(v) any proposed changes to the mandatory HUD language included in the organizational documents.

Copies of all fully executed amendments to the organizational documents must be provided to HUD within ten (10) days of the effective date of the amendment . . . .[56]

**E. HREF Becomes A HoldCo Member With The Potential To Become Manager.**

On February 13, as the HoldCo Agreement required, the HREF Addendum was executed by all HoldCo members, and HREF became a HoldCo member.[57]  At that point, HoldCo had four members: WMPH, SL1, Shelton-Conroe, and HREF.

HREF loaned $4.5 million to HoldCo.[58]  HREF's investment was to be redeemed 42 months from the HREF Addendum's execution.[59]  HoldCo was to repay HREF's contribution, plus a preferred return, in part through a $31,500 payment due the first of every month (the "Monthly Return").[60] HoldCo's Monthly Return obligation was specifically drafted to oblige HoldCo, not OpCo, consistent

---

[56] *Id*. §§ 34–34(i) (hard returns added).

[57] JX 13 at 6–7 [hereinafter "HREF Addendum"].  In that exhibit, the HREF Addendum is at pdf pages 1–8; the collateral assignment, pledge and security agreement among HoldCo, WMPH, SL1, and Shelton-Conroe is at pdf pages 22–27 [hereinafter "Collateral Assignment, Pledge, and Security Agreement"]; HoldCo's security agreement is at pdf pages 28–31 [hereinafter the "Security Agreement"]; and the blocked account control agreement between HoldCo, HREF, and U.S. Bank National Association Depositary Bank ("U.S. Bank") is at pdf pages 32–38 [hereinafter the "BACA"].

[58] HREF Addendum § 2.

[59] *Id*. § 4(iv).

[60] *Id*. §§ 4(iii), 5(i)–5(v).

with HUD's restrictions on OpCo.[61]  HREF's $4.5 million investment was split between $3,235,000 to satisfy the HUD-required escrows, and $1,265,000 to fund the first twenty-five months of the Monthly Return (the "Monthly Return Fund").[62]

In exchange for funding the HUD-required escrows, HREF acquired 100% of the "Special Membership Interests of HoldCo."[63]  HREF did not acquire any HoldCo common equity or managerial rights.[64]  Rather, to protect its investment, HREF contracted for step-in rights if HoldCo did not repay it.[65]  Failure to make HREF's Monthly Return would constitute an "additional rights event" ("ARE") granting HREF certain rights, including the right to "immediately" become HoldCo's sole manager.[66]

> (ii) Upon the occurrence of an ARE, in addition to and without limiting the applicable provisions set forth in the Agreement:
>
> (a) [HREF] shall become attorney-in-fact to act on behalf of the Company and the Members, the Project Managers shall use best

---

[61] JX 49 [hereinafter "Carroll Dep."] 124–31.

[62] HREF Addendum §§ 2, 4 (i)–4(iii); Carroll Dep. 14–15 ("[A]t closing we funded an amount that was to go to an account that we were to be paid our preferred return out of until - - project the property [to be] cash flowing. . . ."); Trial Tr. 15.

[63] HREF Addendum § 2.

[64] *Id*.

[65] *Id*. § 3; Carroll Dep. 222 (explaining HREF "ha[s] the ability to protect [its] investment by operating the facility in a manner designed to maximize financial and economic results" if an Additional Rights Event occurs); *id.* 46–47 (explaining HREF's "most important consideration is making sure that our addendum works to put us in a position to get control of the project if the thing goes sideways").

[66] HREF Addendum §§ 3(i)(a)–(ii)(b).

efforts to modify applicable HUD forms and any other relevant forms, and shall otherwise use best efforts to take all other steps necessary, to provide that [HREF] or its designee shall be a key principal thereunder and to cause [HREF] or its designee to replace the Project Managers as sole manager of the Company with all decision making authority of the Company as the manager of [OpCo]. Without limiting any other provision of this Addendum, the Sponsor Members agree that they shall execute such additional documents as [HREF] may request in order to facilitate the foregoing provisions (including, without limitation, a power of attorney).

(b) [HREF] shall without the consent of the Sponsor Members immediately become the sole manager of the Company with full control over all aspects of the Company and the Company's rights in the Project including, without limitation, the right to remove the Project Managers, and to remove the Sponsor Members from any and all of their management roles with respect to the Company and Project (including, without limitation, removing Sponsor Members from any and/or all of their management rights under the relevant documents of the Project Owner).[67]

The HREF Addendum required the Monthly Return Fund to be deposited in a "Pledged Account" in HoldCo's name, and could "only be drawn on by [HREF] when amounts under this Addendum are due and payable to [HREF]."[68] HoldCo agreed the Pledged Account was a lockbox account subject to a blocked account control agreement, and granted HREF control over, and a first priority security interest in, the Pledged Account.[69]

---

[67] *Id*. §§ 3(ii)–3(ii)(b).

[68] HREF Addendum § 4(iii); *see also* JX 11 at 1; JX 2 at 6.

[69] HREF Addendum § 4(iii); Security Agreement § 3 ("Contemporaneously with the execution and delivery of this Security Agreement, [HoldCo], [HREF] and the [U.S.] Bank are executing a deposit account control agreement . . . ."); BACA § 2 ("[HoldCo]

16

But the Monthly Return Fund was deposited in an account in OpCo's name, not HoldCo's as required. The Pledged Account was opened in OpCo's name.[70] And HoldCo's initial manager "incorrectly booked" HREF's investment as a loan to OpCo.[71] The Pledged Account was exclusively utilized to pay HREF's Monthly Return.[72] Because the Pledged Account was incorrectly opened in OpCo's name, the HREF Addendum's required payments from HoldCo to HREF were all papered as payments from OpCo to HREF.[73]

In the summer of 2024, when this mistake was unearthed, Lindsey correctly noted HREF's investment was not a loan to OpCo, but instead was a HoldCo obligation.[74]

---

covenants with [HREF] that it shall not enter into any acknowledgment or agreement that gives any other person or entity expect [HREF] control over, or any other security interest, lien or title in, the [Pledged] Account."); *id.* § 4 ("Neither [HoldCo], nor any other person or entity, acting through or under [HoldCo], shall have any control over the use of, or any right to withdraw any amount from, the Deposit Account."). The Security Agreement and BACA were executed by Norma Upshur as HoldCo's managing member. The creation of a Pledged Account for the Monthly Return was specifically included in HREF's initial LOI. JX 2 at 6 ("In addition to the providing the Reserves of $3,400,000, [HREF] is providing $1,100,000 to fund preferred returns due to [HREF]. Such amount shall be deposited into an account that can only be used for the designated purpose and be drawn with the consent of [HREF]. At all times, such account shall maintain a balance of sufficient to cover three months' Residual Preferred Return.").

[70] *Compare* BACA *with* JX 61 at 1; *compare* BACA at Recital *with* JX 24 at 1, 9.

[71] JX 58 at 1.

[72] *See generally* JX 61.

[73] *E.g.*, *id.* at 1, 5–10.

[74] JX 58 at 1; *see id.* at 4 ("The most recent financials and 2023 audit have been substantially delayed due to a restatement of the previously issued 2022 audit. It was

## F. Shelton Is Terminated As HoldCo's Co-Manager; MStar Enters The Picture.

On June 9, 2021, Shelton-Conroe was removed as HoldCo's co-manager, taking Shelton herself out of the organizational structure.[75]  By July 14, HoldCo was preparing governance documents to address Shelton-Conroe's removal as HoldCo's co-manager.[76]  Some HoldCo members intended to replace Shelton-Conroe with MStar Conroe, LLC ("MStar") as a HoldCo co-manager.[77]

Under the Borrower Agreement, OpCo had to secure HUD's prior written approval for "any change in Borrower's organization structure" resulting in the removal of Shelton or Shelton-Conroe.[78]  OpCo did not seek or obtain that preapproval.

Instead, eight months after Shelton-Conroe's removal as co-manager, HUD provided Greystone its "Preliminary Approval of Change in Ownership &

---

discovered, recently, that the contribution by [HREF] was booked on [OpCo]'s Balance sheet as a Note Payable []. This was never the case, and the auditors have been working to correct [OpCo]'s Balance sheet as well as [HoldCo]'s Balance sheet.").

[75] *Id*. at 1.

[76] JX 17.

[77] JX 18.

[78] Borrower Agreement § 46(b); *see also* HoldCo Agreement § 14.1(b) ("While Shelton is a Manager … Shelton shall have the authority to take any act or make any decision … *with respect to resident care and all other decisions regarding day-to-day management and operation of the Project*.") (emphasis added).

Management Agent" (the "Preliminary Approval Letter").[79] That Preliminary Approval Letter provided "preliminary approval authorizing [the] replacement of Lisa Ann Shelton by [MStar], as a manager and member of the subject's Borrower, [OpCo]."[80] But Shelton was not a member of OpCo; her entity was a member and co-manager of HoldCo.[81] HoldCo was OpCo's manager at that time.[82]

HUD's Preliminary Approval Letter to Greystone imposed on OpCo organizational and preapproval requirements for MStar similar to those HUD had imposed for Shelton-Conroe and Shelton:

> 2. The Borrower's organizational documents must be amended to add MStar Conroe LLC as a member and co-manager of the Borrower and remove Lisa Ann Shelton. In addition, the documents shall be amended to address the below provisions and be satisfactory to HUD:
>
> a. Clearly delineate MStar Conroe LLC as a co-manager roles and responsibilities and provide it sufficient operational control to allow to direct day-to-day operations at the facility including the sole right to manage the operations, including hiring all the employees and operating the facility.
>
> b. Give MStar Conroe LLC the deciding vote between the two co-managers: and,

---

[79] JX 19. The Preliminary Approval Letter purports to be in response to Greystone's "September 29, 2020 transfer of physical asset (TPA) proposal." At trial, the parties appeared to agree that reference was a mysterious mistake. Trial Tr. 37–40.

[80] JX 19.

[81] OpCo Agreement, Ex. A (identifying LindseyCo and HoldCo as the two OpCo members); OpCo Agreement § 14.1(b); HoldCo Agreement § 14.1(d) (providing that "WMPH and Shelton will serve as [HoldCo's] initial Managers").

[82] OpCo Agreement § 14.1(b).

c. Prevent MStar Conroe LLC's removal as a co-manager of the Borrower without HUD and Greystone Funding's explicit written approval.

. . . You have 45 days from the date of this letter in which to execute and record all applicable required documentation. All mandatory documents must be submitted and executed in the form as reviewed and approved by HUD Office of General Counsel.[83]

HoldCo's members other than HREF sought to amend the HoldCo Agreement to conform to those conditions. WMPH, SL1, Shelton-Conroe, and MStar executed the First Amendment to the Limited Liability Agreement for WM Conroe Property Holdings LLC (the "MStar Amendment").[84] The MStar Amendment would bake into the HoldCo Agreement that HUD and Greystone must provide written approval for MStar to be removed as HoldCo's Manager.[85] The relevant provisions of the MStar Amendment state:

1. Replacement of Shelton. All references to "Shelton-Conroe, LLC, an Oregon limited liability company" in the Operating Agreement (and in all other provisions contained in this Amendment and henceforth) shall hereby be replaced with "MStar Conroe, LLC, a Delaware limited liability company".

2. Appointment of Manager. Pursuant to Section 14.1 of the Operating Agreement, the undersigned appoint MStar as a Manager of the Company.

3. Removal of Manager. Notwithstanding anything contained in the Operating Agreement or this First Amendment, removal of MStar as a

---

[83] JX 19 §§ 2–4.

[84] JX 20 [hereinafter the "MStar Amendment"].

[85] *Id.* §§ 1, 3.

20

Manager of the Company shall require the explicit written approval by each of (i) the U.S. Department of Housing and Urban Development and (ii) Greystone Funding Company, LLC, a Delaware limited liability company.[86]

The MStar Amendment was not effective.[87] The HoldCo Agreement requires "[a]ny amendments to this Agreement . . . be in writing and shall be approved by all the Members."[88] The MStar Amendment was not approved by all members of HoldCo: HREF did not execute the MStar Amendment to the HoldCo Agreement.[89] HREF was not even mentioned in the MStar Amendment.[90]

More documents purporting to paper MStar's status as HoldCo's manager followed. Eight months after the MStar Amendment and HUD's Preliminary Approval Letter, OpCo and HUD executed the First Amendment to the Borrower Agreement (the "First Amendment to Borrower Agreement").[91] It updated HUD's notice and approval requirements to reflect MStar as a HoldCo member and

---

[86] *Id*. §§ 1–3.

[87] 6 *Del. C.* § 18-302(d) ("If a limited liability company agreement provides for the manner in which it may be amended . . . it may be amended only in that manner or as otherwise permitted by law.").

[88] HoldCo Agreement § 20.12.

[89] Joint Stip. ¶ 32 ("HREF was not included as a signatory, HREF did not sign the [MStar] Amendment, and HREF was never consulted about this proposed amendment to the HoldCo Agreement."); *see generally* MStar Amendment. Carroll saw the MStar Amendment for the first time at his deposition. Carroll Dep. 197.

[90] *See generally* MStar Amendment.

[91] Joint Stip. § 33; JX 22.

manager, and Robert A. Sweet's status as HUD's MStar contact.[92]   The First

Amendment to Borrower Agreement was executed by OpCo on October 27, 2022,

and approved by HUD on November 9.[93]

### G. Lindsey Obtains A Majority Membership Stake, Assumes Control, And Closes The Pledged Account.

More changes in HoldCo's membership occurred without HUD preapproval

and without effective changes to HoldCo's organizational documents.   In

December 2022, Lindsey bought a majority stake in WMPH through LindseyCo.[94]

Once Lindsey purchased a majority of WMPH, he held a majority stake in both

HoldCo members.

Just like previous transactions, this one changed the HUD contact and

required HUD preapproval under the HUD Documents.[95]   Just like previous

transactions, HoldCo's members excluding HREF purported to cause HoldCo to

---

[92] JX 22 at Recitals A–F; *id*. at 3(b).

[93] Joint Stip. ¶ 33; JX 22 at 5–6.

[94] Joint Stip. ¶ 34; JX 28 at 1.

[95] Borrower Agreement §§ 34, 34(i) ("Borrower shall not without the prior written approval of HUD, including without limitation in accordance with Program Obligations . . . (i) any amendment that results in the creation or elimination of a [Key] Principal . . . (ii) any amendment that in any way affects the Loan Documents; (iii) any amendment that would change the identity of the persons and/or entities authorized to bind Borrower previously approved by HUD or pre-approve a successor general partner, manager or member to bind the partnership or company for any matters concerning the Project which require HUD's consent or approval"); JX 22 at Recital F (identifying WMPH's principal Norma Upshur as a "Key Principal" under the Loan Documents); JX 30 at Recitals D–E, §§ 2–3, Ex. B (Lindsey replacing WMPH's principal as "Key Principal" under the Loan Documents); OpCo Agreement §§ 14.6–14.6(g).

act: here, purportedly by unanimous written consent to cause OpCo to update the Borrower Agreement, and to authorize Lindsey to act "on behalf of [HoldCo] as a member and sole Manager of [OpCo]."[96] It took nine months for OpCo and HUD to update the Borrower Agreement to name Lindsey as the designated HUD contact.[97] Just like previous transactions, no HUD preapproval is in the record. And just like previous transactions, the HoldCo members other than HREF purported to amend the HoldCo Agreement.[98]

Lindsey began speaking for OpCo and HoldCo.[99] On January 12, 2023, Lindsey asked HREF to approve closing the Pledged Account and using a new

---

[96] JX 31 at Recital ("[WMPH], a Delaware limited liability company [], [SL1], a Delaware limited liability company, and [MStar], a Delaware limited liability company [], **being all the members** [] of [HoldCo], a Delaware limited liability company [], hereby consent to the adoption of, and adopt, the following as Unanimous Written Consent of the Members of the Company as of September 1, 2023.") (emphasis added); *id.* at 2 ("[T]he Members approve of the [HoldCo]'s approval and actions to cause [OpCo] to enter into the Second Amendment [to Borrower Agreement]; *Id.* ("FURTHER RESOLVED, that the Members authorize, direct, and empower Lindsey as 'Authorized Representative' of [HoldCo] and [OpCo], to take any and all actions . . . as a member and sole Manager of [OpCo], . . . including, but not limited to" updates to the Borrower Agreement).

[97] JX 30 ¶ E; JX 30 at Ex. B; Joint Stip ¶¶ 34, 36.

[98] JX 32 ("WHEREAS, effective December 28, 2022, C[APA] Consulting, LLC, a Tennessee limited liability company [] sold and assigned all of its interest in [WMPH] to Conroe Senior Living, LLC, a Texas limited liability company, and consequently C[APA] and Norma B. Upshur no longer own any interest, directly or indirectly, in Holdings or the Company."); *id.* at ¶ 1 (amending Section 15.2 to state "WMPH warrants, represents, agrees and acknowledges that Curtis Lindsey owns or controls, directly or indirectly, a majority of the voting rights of WMPH."); *see generally* JX 31.

[99] *E.g.*, JX 54; JX 23 (accessing OpCo's bank account information and seeking to close an OpCo bank account); JX 28 (providing an investor update, which included OpCo financial statements and noting, "I became the Managing Member"); *see* JX 33

23

account Lindsey intended to open at his local bank to pay the HREF Monthly Return.[100] Lindsey explained to HREF that utilizing his bank for HREF's Monthly Return would be more convenient and allow Lindsey to easily "move funds to cover your interest carry if need be."[101] HREF consented and provided the necessary documentation to close the Pledged Account.[102]

## H. HoldCo and HREF Extend HREF's Redemption Deadline, Referencing MStar As A Member.

HREF's investment in HoldCo was due to be fully redeemed by August 2023.[103] When that seemed unlikely, HREF and HoldCo agreed to extend the redemption deadline to August 13, 2024.[104] They did so via an August 13, 2023,

---

(identifying himself as "the managing member and the majority owner" and informing the Project's management company "the financial reporting should come from me as the managing member"); JX 58 (noting "I took over managing member 12/28/2022"). I make no comment on whether Lindsey was properly empowered to speak for HoldCo or OpCo.

[100] JX 23 at 4.

[101] *Id.*

[102] JX 24.

[103] HREF Addendum § 4(iv). In March 2023, Lindsey updated the investors on the status of the Project and noted that "[t]he balance sheet reflects a loan to [HREF] in the amount of $4.5MM, as well as accrued interest of $318K ($31.5k paid monthly) that is due and payable August 2023." JX 28 at 2–3. In July 2023, Lindsey wrote to HoldCo's counsel and HREF noting "that [HREF] and I have started the conversation of the extension and renewal of the [HREF] loan for our [P]roject. We currently have an outstanding balance of [$]4.5MM and accrued interest of [$]315K that is due next month. My proposal is to pay the interest and paydown the note [by] [$]500K. [T]his would leave a balance of [$]4MM on a 1-year extension." JX 57.

[104] JX 29 [hereinafter "First Amendment to HoldCo Agreement"] at Recital F ("The scheduled Anticipated Redemption Date under the Addendum is August 13, 2023. The Sponsor Parties have requested an extension of the Anticipated Redemption Date to

First Amendment to Amended and Restated Addendum to HoldCo Agreement (the "First Amendment to HoldCo Agreement").[105] The First Amendment to HoldCo Agreement required HoldCo to pay HREF $500,000 upon execution, and increased the Monthly Return to $40,000.[106] The First Amendment to HoldCo Agreement did not alter HREF's ARE rights or the conditions that would constitute an ARE.[107]

The First Amendment to HoldCo Agreement was executed by all members of HoldCo, as the HoldCo Agreement requires.[108] It states the HoldCo Agreement was amended by the MStar Amendment; that MStar became a HoldCo manager and member; that HoldCo's members are HREF, WMPH, MStar, and SLI; and that WMPH and MStar are HoldCo's managers.[109]

---

August 13, 2024, and HREF has agreed to such extension on the terms and conditions set forth below.").

[105] *See generally id.*

[106] *Id.* §§ 1(b)–(c); *see* JX 35.

[107] First Amendment to HoldCo Agreement § 7 ("The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided in this Amendment, operate as a waiver of any right power or remedy of HREF, nor constitute a waiver of any provision of the [HoldCo] Agreement or [HREF] Addendum or any other documents, instruments and agreements executed or delivered in connection therewith."); HREF Addendum §§ 3(i)–3(ii)(b).

[108] HoldCo Agreement § 20.12; First Amendment to HoldCo Agreement at 5–7.

[109] First Amendment to HoldCo Agreement at Recital ¶ A (; *id.* §§ 3–3(c); *id.* §6(c) ("Except as specifically modified pursuant to the terms hereof, the HoldCo Agreement and the [HREF] Addendum (and all covenants, terms, conditions and agreements therein) shall remain in full force and effect, and are hereby ratified and confirmed in all respects by [HoldCo, WMPH, MStar, and SL1]."); *see also id.* § 8(c) ("The recitals set forth at the beginning of this Amendment and the schedules attached hereto are incorporated by reference.").

**I. HoldCo Stops Paying HREF, HREF Asserts Management Rights, and WMPH Refuses To Recognize Them.**

HREF received its one-time $500,000 payment and Monthly Returns through February 2024.[110] Then the HREF Monthly Return payments stopped.[111]

On November 11, HREF told WMPH and Lindsey that "HREF has not received any payment due under the [HREF Addendum] since March 2024"; that the "failure to timely pay, redeem or distribution any amount due to [HREF]" under the HREF Addendum "constitute[s] an [ARE];" and that once HREF's ARE rights are triggered, "[HREF] shall without the consent of the Sponsor Members immediately become the sole manager of [HoldCo] with full control over all aspects of [HoldCo] . . . ."[112] HREF went on: "effective immediately HREF intends to assume the management responsibilities for [HoldCo]."[113] HREF requested WMPH's assistance in transitioning the managerial functions, including by "executing documents that may be necessary or reasonable[.]"[114] WMPH refused to recognize HREF as HoldCo's manager.

HREF also contacted Greystone and the Project's management company to inform them HREF had exercised its rights under the HREF Addendum to assume

---

[110] Joint Stip. ¶ 37.

[111] *Id.*

[112] JX 39; HREF Addendum §§ 3(i)(a)-3(i)(e).

[113] JX 39.

[114] *Id.* at 2.

control of HoldCo and requested information to transfer managerial authority.[115] Lindsey has stymied HREF's efforts to facilitate managerial control, including its efforts to engage with Greystone.[116]

## J. Litigation Ensues and MStar Is Belatedly Given Notice.

HREF initiated this action on November 8, 2024, and amended its complaint (the "Amended Complaint") on November 26.[117] The Amended Complaint contains six counts. The Amended Complaint added HoldCo as a nominal defendant and added Count V, which seeks a declaration under 6 *Del. C.* § 18-110(a) that HREF, a HoldCo member, is HoldCo's sole manager.[118] Only Count V, requesting declaratory relief against defendant WMPH and nominal defendant HoldCo, was tried on an expedited basis.[119] In Count V, HREF requests an order that HREF is the sole manager of HoldCo with control over all aspects of HoldCo, including the right to remove defendant WMPH from all management roles within HoldCo and with respect to the Project.[120] Trial on Count V was held on a paper record on August 20, 2025.[121]

---

[115] JX 39; JX 59; JX 60; Carroll Dep. at 59–62.

[116] Carroll Dep. 59–60; JX 50 at 1.

[117] D.I. 1; D.I. 18.

[118] AC ¶¶ 19, 150–57, Prayer (vii); Joint Stip. ¶¶ 44–45.

[119] D.I. 48; D.I. 62.

[120] AC ¶¶ 152–157.

[121] D.I. 71.

After trial, I came to understand that MStar, a purported HoldCo member that Defendants argue was and is a HoldCo co-manager instead of HREF, never received notice of HREF's Section 18-110 claim.[122] Plaintiff conceded it only provided notice of the Amended Complaint to defendant WMPH, not HoldCo, and therefore failed to adequately inform MStar of Plaintiff's Section 18-110 claim.[123] When a party with a potential claim to the *res* does not receive adequate notice, that party is not bound to the results of the litigation.[124] Accordingly, on October 2, I informed the parties that Plaintiff had to give MStar notice before the Court could rule on Count V.[125] I also advised the parties that I believed HREF was HoldCo's sole manager.[126]

---

[122] D.I. 80.

[123] PB 11–12. If Plaintiff had served the Amended Complaint on HoldCo's registered agent, that would have constituted constructive service on MStar, but Plaintiff did not do that. *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *11 (Del. Ch. Mar. 31, 2003) ("[T]he plaintiffs may constructively serve [defendant] under § 18-110(a), because he is a 'person . . . whose right to serve as a manager is contested.'").

[124] *Cedar Lane Farms, Inc. v. Taylor*, 1992 WL 111210, at *3 (Del. Ch. May 18, 1992) ("[No]tice to Cedar Lane by publication alone was constitutionally inadequate and does not bind Cedar Lane to the results of the prior litigation."); *Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *5 (Del. Ch. Mar. 20, 2012) (explaining a claimant to the corporate office in question must receive "actual notice" of the dispute before "the adjudication is binding").

[125] D.I. 80; *Cedar Lane Farms, Inc.*, 1992 WL 111210, at *3–4.

[126] D.I. 80.

28

On October 6, Plaintiff emailed my October 2 letter, the Amended Complaint, and the parties' pretrial briefs to MStar's principals.[127] They both opened the service email by October 7.[128] Also on October 7, MStar's registered agent was served with those same documents.[129] Plaintiff filed an affidavit of service on October 14, and followed up on November 14 with a letter informing the Court that MStar had received notice of Count V.[130] Plaintiff promptly served its November 14 letter on MStar's registered agent.[131]

On November 18, Plaintiff filed a letter it received from MStar's counsel.[132] MStar's letter noted MStar received Plaintiff's service package, and subsequently "participated in multiple telephone calls with Plaintiff['s] representatives" regarding Count V.[133] MStar shared its general view that Plaintiff's filing contained factual inaccuracies that "materially affect the factual record on which Plaintiff[] ask[s] the Court to rely."[134] MStar concluded by noting "MStar remains willing to continue discussion with Plaintiff[] to clarify the historical facts, or, if

---

[127] D.I. 84; *id.* at Affidavit of Rebecca Woods Concerning Notice to MStar Conroe LLC Regarding Count V of the Amended Complaint and Status of Proceedings [hereinafter "Woods Aff."] ¶¶ 3–5.

[128] D.I. 84 at Exs. B–G; Woods Aff. ¶¶ 7–8.

[129] D.I. 84 at 3; Woods Aff. ¶ 9; D.I. 81.

[130] D.I. 81; D.I. 84.

[131] D.I. 85.

[132] D.I. 86 [hereinafter "MStar Letter"].

[133] MStar Letter at 1.

the Court prefers, to participate in a more formal process to ensure the record is complete."[135]  I gave MStar until December 31 to enter its appearance in this action if it wished to participate.[136]  It did not do so.[137]

For *in rem* proceedings, including actions under Section 18-110, due process requires "reasonable steps be taken to notify claimants to the office of the forthcoming adjudication and that they receive an opportunity to be heard."[138]  Due process in that setting requires notice to the claimant that is "reasonably calculated, under all the circumstances, to apprise [the claimant] of the pendency of the action and afford [it] an opportunity to present [its] objections."[139]  For a Delaware limited liability company, service of process must be made by delivering a copy personally to its registered agent, which must forward it to the company.[140]  The notice must reasonably convey information necessary to apprise the claimant of the disputed corporate office "and it must afford a reasonable time for [the claimant] to

---

[134] *Id.* at 1.

[135] *Id.* at 2.

[136] D.I. 88; D.I. 89.

[137] *See* D.I. 93.

[138] *Feeley*, 2012 WL 966944, at *5 (quoting *Haft v. Dart Gp. Corp.*, 1996 WL 255899, at *2 (Del. Ch. Apr. 26, 1996)).

[139] *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950); *see Tsipouras v. Tsipouras,* 677 A.2d 493, 496 (Del. 1996) ("The right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" (quoting *Fuentes v. Shevin,* 407 U.S. 67, 80 (1972))).

[140] 6 *Del. C.* § 18-105(a); 6 *Del. C.* § 18-104(e)(1)(c).

make [its] appearance."[141]  "[I]f with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied."[142]

Once a claimant to a contested corporate office receives actual notice of the claim, "failure to participate in [the] adjudication will not foreclose the authoritative adjudication in this proceeding of [its] claim of title."[143]  Actual notice can be established where the recipient of service demonstrates knowledge of the action, particularly where following service the recipient directly communicates with a party to the action regarding such action.[144]

MStar received statutorily compliant, actual notice of Count V.  Its principals and registered agent received the operative pleading, the parties' pretrial

---

[141] *Mullane*, 339 U.S. at 314; *see Lynch v. Gonzalez Gonzalez*, 2020 WL 3422399, at *5 (Del. Ch. June 22, 2020) ("A proceeding under Section 18-110(a) is summary in character, and its scope is limited to determining those issues that pertain to the validity of action to elect or remove a manager.  A Section 18-110 proceeding is designed to focus with precision on the corporate interest in prompt resolution of grievances respecting claims to office." (internal footnote and quotations omitted)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE).

[142] *Prunckun v. Delaware Dep't of Health & Soc. Servs.,* 201 A.3d 525, 549 (Del. 2019) (quoting *Mullane,* 339 U.S. at 314–15).

[143] *Haft*, 1996 WL 255899, at *2 (emphasis removed).

[144] *E.g.*, *Walker v. Martin*, 54 A.3d 257 (Del. 2012) (ORDER) (finding a phone call after receiving service to constitute actual notice in a custody proceeding); *Hines v. New Castle Cnty.*, 640 A.2d 1026, 1029 (Del. 1994); *Maldonado v. Matthews*, 2010 WL 663723, at *4 (Del. Super. Feb. 23, 2010) (finding a voicemail from the party served, acknowledging that service had been received, to be "satisfactory" evidence of personal delivery even though the certified mail was returned as "unclaimed").

31

briefs, and my views on service and the merits after trial.[145]  MStar demonstrated its knowledge of this action via its letter and multiple calls with HREF.[146]  MStar allowed the December 31 deadline to pass without retaining counsel and entering its appearance.   Having received adequate notice, MStar shall be bound by the adjudication of Count V.   This is my post-trial decision.

## II.   ANALYSIS

HREF seeks a ruling that it is HoldCo's sole manager with control over all aspects of HoldCo and HoldCo's rights with respect to the Project.[147]  Under 6 *Del. C.* § 18-110(a), "[u]pon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company."[148]   "A  proceeding  under Section 18-110(a) 'is  summary  in character, and its scope is limited to determining those issues that pertain to the validity of action to elect or remove' a manager."[149]   A Section 18-110 plaintiff "bears the burden of proving by a preponderance of the evidence that it is entitled

---

[145] D.I. 81; D.I. 84; Woods Aff. ¶¶ 3–5, 9.

[146] MStar Letter at 1; Woods Aff. ¶ 10.

[147] AC ¶ 157.

[148] 6 *Del. C.* § 18-110(a).

[149] *Llamas v. Titus*, 2019 WL 2505374, at *15 (Del. Ch. June 18, 2019) (quoting *Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011)).

to relief."[150]

The limited liability company agreement is the primary governor of "the affairs of a limited liability company and the conduct of its business."[151] A Delaware limited liability company is a "creature of contract" and its members "must appreciate that 'with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights.'"[152] "The first step when analyzing a case involving the internal affairs of an LLC is . . . to examine the LLC agreement to determine whether it addresses the issue."[153] "LLC members' rights [and obligations] begin and typically end with the Operating Agreement."[154] "When analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts."[155] Where the agreement covers the issue, the agreement controls unless it violates a mandatory provision under the Delaware Limited Liability Company

---

[150] *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008).

[151] 6 *Del. C.* § 18-101; *Soleimani v. Hakkak*, 2024 WL 1593923, at *5 (Del. Ch. Apr. 12, 2024) (explaining a Section 18-110 claim "turns on the interpretation of contracts governing the parties' relationship"), *aff'd,* 327 A.3d 1060 (Del. 2024) (TABLE).

[152] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) (quoting *The Haynes Fam. Tr. v. Kinder Morgan G.P., Inc.*, 135 A.3d 76, 2016 WL 912184, at *2 (Del. Mar. 10, 2016) (TABLE)).

[153] *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018).

[154] *Walker v. Res. Dev. Co., L.L.C. (DE)*, 791 A.2d 799, 813 (Del. Ch. 2000).

[155] *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 924 (Del. 2023).

Act (the "Act").[156]

Then, if the agreement is silent on the issue, the inquiry reaches the second step, which instructs the Court to "look to the Act" as a gap filler "to see if one of its default provisions apply."[157] The Act is "an enabling statute . . . 'replete with fundamental provisions made subject to modification in the [a]greement, and therefore leaves latitude for substantial private ordering,' provided that statutory and judicially imposed parameters are honored."[158] If neither the agreement nor the Act address the issue before the Court, "the rules of law and equity . . . shall govern."[159]

When an LLC desires to create a manager-managed structure, "the LLC agreement must expressly vest authority in one or more managers."[160] It does so by contract: "[t]he selection of managers is subject to the control of the members as provided in the limited liability company agreement or the certificate of formation . . . ."[161] Section 18-402 of the Act is clear, and mandatory:

---

[156] *In re Coinmint, LLC*, 261 A.3d 867, 900 (Del. Ch. 2021).

[157] *Holifield*, 304 A.3d at 923 (quoting *Coinmint*, 261 A.3d at 900–01).

[158] *Holifield,* 304 A.3d at 899 (quoting *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999)).

[159] *Godden*, 2018 WL 3998431, at *7 (quoting 6 *Del. C.* § 18-1104).

[160] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *19 (Del. Ch. July 19, 2019); 6 *Del. C.* § 18-402.

[161] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.05[A], at 9-54 (2d ed. 2025).

management "shall be vested in the manager who shall be chosen in the manner provided in the limited liability agreement."[162] Where an LLC agreement provides such managerial authority, "such agreements will be honored by a reviewing court."[163]

Section 18-402 tells us to look to the HoldCo Agreement to identify HoldCo's manager.[164] Section 18-402 vests HoldCo's management "in the manager who shall be chosen in the manner provided in the [HoldCo] agreement."[165] The HoldCo Agreement states that it "shall be managed by a Manager" and that "[v]acancies in the position of Manager will be filled by the approval of the Members . . . ."[166] The HoldCo Agreement further provides that "[t]he Members and [HREF] intend to execute an Addendum to this Agreement" and "[a]fter execution of the Addendum the terms of the Addendum shall control

---

[162] 6 *Del. C.* § 18-402; *Elf Atochem N. Am., Inc.*, 727 A.2d at 296 (explaining when interpreting the Act "the legislature's use of 'may' connotes the voluntary, not mandatory or exclusive, set of options"); *see Delaware Citizens for Clean Air, Inc. v. Water & Air Res. Comm'n*, 303 A.2d 666, 667 (Del. Super. 1973) ("While the words 'shall' and 'may' do not always by themselves determine the mandatory or permissive character of a statute, it is generally presumed that the word 'shall' indicates a mandatory requirement."), *aff'd,* 310 A.2d 128 (Del. 1973); *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1219 (Del. 2021) ("[W]hen construing [a] statute, 'shall' generally signals [a] mandatory requirement while 'may' is permissive. Further, the mandatory 'shall' ... normally creates an obligation impervious to judicial discretion." (internal cites and quotations omitted)).

[163] *Huatuco v. Satellite Healthcare*, 2013 WL 6460898, at *1 (Del. Ch. Dec. 9, 2013).

[164] 6 *Del. C.* 18-402.

[165] *Id.*

over any conflicting terms of inconsistencies with this Agreement."[167]   The HoldCo Agreement as modified by the HREF Addendum is clear and specific: upon the occurrence of an ARE, "[HREF] shall without the consent of the Sponsor Members immediately become the sole manager of the Company."[168]  The HoldCo Agreement does not mention HUD, or HUD's rules or regulations, in any manner.[169]   Under Section 18-402, the HREF Addendum provisions are dispositive.

It is undisputed that HoldCo failed to timely pay HREF's Monthly Returns,[170] constituting an ARE that triggered HREF's right to immediately become HoldCo's sole manager.[171]  Under the Act, HoldCo Agreement, and HREF Addendum, that is the end of the story.

Defendants seek to avoid that conclusion by contending HUD's written approval was needed before HREF could become manager.  These arguments stray

---

[166] HoldCo Agreement §§ 14.1(a), 14.1(d).

[167] *Id*. § 5.1.

[168] HREF Addendum §§ 3(ii)-3(ii)(b).

[169] *See generally* HoldCo Agreement.

[170] Joint Stip. ¶ 37.

[171] HREF Addendum §§ 3(i)(e) ("Each of the following *shall* constitute an [ARE] . . . *failure to timely pay*, redeem or distribute any amount due to [HREF] including but not limited to, the payments required under Sections 5, 6 and 7"); *see* First Amendment to HoldCo Agreement ("Except as specifically modified pursuant to the terms hereof, the [HoldCo] Agreement and the [HREF] Addendum (and all covenants, terms, conditions and agreements therein) shall remain in full force and effect, and are hereby ratified and confirmed in all respects by the Sponsor Parties.").

36

beyond the sanctioned two-step analysis for determining rights in an LLC: no iteration of the HoldCo Agreement requires HUD approval, and neither does the Act. Defendants look for that requirement in a series of arguments increasing in distance from the HoldCo Agreement. Defendants first look to the HoldCo Agreement's purpose clause, and to the MStar Amendment's HUD and Greystone approval requirements.[172] From there, Defendants turn outside the HoldCo Agreement. They look to HUD's approval requirements in the HUD Documents between HUD and OpCo.[173] And, swinging for the fences, they look to HUD rules and regulations to argue HREF's step-in rights are illegal and unenforceable.[174] None of Defendants' arguments impede or displace the operation of the HREF Addendum's specific provisions making HREF HoldCo's sole manager upon the occurrence of an ARE.

### A. The HoldCo Agreement Does Not Compel HUD Preapproval.

I begin with Defendants' arguments under the only statutorily recognized source of input on choosing a manager: the HoldCo Agreement.[175] Defendants contend the HoldCo Agreement's purpose clause binds HoldCo to the HUD approval requirements in OpCo's HUD Documents. They also contend the MStar

---

[172] MStar Amendment § 3; Trial Tr. 115.

[173] DOB 1–2, 17.

[174] DR 19–24; Trial Tr. 110–116, 150–155, 157–158.

[175] *See* 6 *Del. C.* § 18-402.

Amendment's HUD approval requirements are effectively part of the HoldCo Agreement.

Defendants' first argument tries to chain HoldCo's purpose clause to the HUD Documents' approval requirements. The first link: the HoldCo Agreement's purpose provision stating "[t]he purpose of [HoldCo] is to be the manager of [OpCo] and to cause [OpCo] to be operated in accordance with the [OpCo] Agreement[.]"[176] The second link: the OpCo Agreement's "HUD Provisions" providing that "[w]hile the HUD Loan is outstanding" OpCo shall "execut[e] deliver[] and perform[] its obligations under the HUD Loan Documents . . . ."[177] And the third link: the HUD approval requirements in the HUD Documents.[178] Linking the three together, Defendants conclude "HREF is bound to comply with all HUD Loan Documents and related requirements" at the HoldCo level, so HREF cannot become HoldCo's manager without prior HUD approval.[179]

Defendants' argument asks this Court to use HoldCo's purpose provision to reach through OpCo's operating agreement to the HUD Documents in a way that nullifies the HoldCo Agreement's specific step-in rights for HREF. Defendants' theory would displace the HoldCo Agreement and bind HREF to obligations found

---

[176] HoldCo Agreement Art. 4.

[177] OpCo Agreement §§ 14.6(a), 14.6(h).

[178] *E.g.*, Note § 16; Borrower Agreement §§ 34(i), 46; First Amendment to Borrower Agreement §§ 2–3.

in OpCo's contracts with HUD. Defendants offer no Delaware precedent to support determining HoldCo's manager according to OpCo's operating agreement and promises to a third party, rather than HoldCo's operating agreement as the Act requires.

The Act does not require an LLC operating agreement to include a purpose clause, and by default permits companies to "carry on any lawful business, purpose, or activity."[180] Purpose clauses "generally may be viewed more as helpful clarification than as a necessity and, depending on their wording, may function more as limiting than enabling provisions."[181] An operating agreement's purpose clause defines the scope of action the company can permissibly undertake.[182] It serves to "restrict the company's power to engage in any activity

---

[179] DR 17.

[180] 6 *Del. C.* § 18-106(a).

[181] Symonds & O'Toole, *supra* note 161, § 2.07[A], at 2-22.

[182] *Symbiont.io, Inc. v. Ipre Hldgs., LLC*, 2021 WL 3575709, at *43 (Del. Ch. Aug. 31, 2021) ("A purpose clause that places limits on what an entity can do deprives the entity of the authority to engage in activities that otherwise would be permissible under default principles of law."); *Malt Fam. Tr. v. 777 Partners LLC*, 2023 WL 7476966, at *8 (Del. Ch. Nov. 13, 2023) (noting a purpose clause in an operating agreement acts to "deprive the entity of authority to validly engage in activities beyond those limits"); *see also In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *4 (Del. Ch. Apr. 23, 2009) ("[A]n important reason for parties to include a broad purpose clause in an entity's governing instrument is to ensure that the entity has flexibility to adapt in the face of changing circumstances.").

not in furtherance of its stated objective."[183]  "A limited purpose clause restricts the company, not its members."[184]

So the purpose clause defines HoldCo's scope of authority to act.[185]  It can "be the manager of [OpCo] and cause [OpCo] to be operated in accordance with the [OpCo] Agreement . . . ."[186]  And the HoldCo Agreement limits the purpose clause:  HoldCo's purpose "shall not be extended by implication or otherwise unless expressly agreed to in writing by all the Members."[187]  The purpose clause does not create or impose conditions on who can be HoldCo's manager, particularly where the HREF Addendum speaks to that specifically.[188]    The

---

[183] Symonds & O'Toole, *supra* note 161, § 2.09[B], at 2-27.

[184] *Malt Fam. Tr.*, 2023 WL 7476966, at *8; *Symbiont.io, Inc.*, 2021 WL 3575709, at *43.

[185] *Malt Fam. Tr.*, 2023 WL 7476966, at *8; *Symbiont.io, Inc.*, 2021 WL 3575709, at *43.

[186] HoldCo Agreement Art. 4.

[187] *Id.*

[188] *See Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 1930428, at *6 (Del. Ch. June 19, 2007) ("Delaware law will not create contract rights and obligations that were not part of the original bargain, especially, where, as here, the contract could easily have been drafted to expressly provide for them.") (quoting *Union Oil Co. of California v. Mobil Pipeline Co.*, 2006 WL 3770834, at *12 (Del. Ch. Dec. 15, 2006)); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define . . . the rights and obligations of its members."); *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *see also EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) (explaining "an LLC agreement . . . is a foundational document that controls the governance of the entity").

40

purpose provision limits the company's power and authority to undertake certain acts or transactions; it does not override a different provision specifically governing how a manager is chosen.[189]

Defendants next look to the MStar Amendment, specifically its provision requiring HUD and Greystone written preapproval to remove MStar as manager.[190] Defendants contend the MStar Amendment is valid and binding on HoldCo and its members, including HREF, because HREF and the other HoldCo members ratified the MStar Amendment through the First Amendment to the HoldCo Agreement.[191] Defendants argue the First Amendment to the HoldCo Agreement's reference to the MStar Amendment in the recitals, its references to MStar as a member and manager, and its "incorporation by reference" provision ratified the MStar Amendment, such that its preapproval terms are binding on HREF.[192]

---

[189] *See* Symonds & O'Toole, *supra* note 161, §§ 2.06–2.09[B].

[190] MStar Amendment § 3 ("**Removal of Manager**. Notwithstanding anything contained in the Operating Agreement or this First Amendment, removal of MStar as a Manager of the Company shall require the explicit written approval by each of (i) the U.S. Department of Housing and Urban Development and (ii) Greystone Funding Company, LLC, a Delaware limited liability company.").

[191] DR 11-14.

[192] DOB 17–18; Trial Tr. 115.

Defendants also contend HREF is bound by the MStar Amendment because HREF relies on the First Amendment to HoldCo Agreement for its Section 18-110 claim. DOB 14; *id.* n.27 (citing AC ¶¶ 150–57); *see also* DR 11–14. But HREF is not relying on that First Amendment to HoldCo Agreement. Trial Tr. 127–28. The rights HREF seeks to vindicate here are granted by the HREF Addendum—not the First Amendment to HoldCo Agreement. AC ¶¶ 152–57; AC ¶ 3 (defining Exhibit 2 as the HoldCo

41

The HoldCo Agreement is silent on ratification, so I look to the Act.[193] Section 18-106(e) "provides a safe harbor procedure for the ratification or waiver of acts or transactions taken by or in respect of a Delaware limited company under the [] Act or limited liability company agreement that are void or voidable."[194] Section 18-106(e) permits an LLC to ratify a company act that is void or voidable because the approvals required by the company's operating agreement were not obtained via its "members, managers or other persons whose approval would be required under the limited liability company agreement."[195]

The authority to ratify "is limited to ratification of the LLC's own breaching acts. It does not apply to acts of LLC members."[196] Two of HoldCo's members,

---

Agreement); AC Ex. 2 (attaching HoldCo Agreement, HREF Addendum, an unexecuted draft First Amendment to HoldCo Agreement, an unexecuted Amended and Restated Addendum to HoldCo Agreement, and the First Amendment to HoldCo Agreement).

[193] *Achaian, Inc. v. Leemon Fam. LLC*, 25 A.3d 800, 802 (Del. Ch. 2011); *Paul v. Delaware Coastal Anesthesia, LLC*, 2012 WL 1934469, at *2 (Del. Ch. May 29, 2012).

[194] Symonds & O'Toole, *supra* note 161, § 2.10, at 2–29.

[195] 6 *Del. C.* § 18-106(e).

[196] *Holifield*, 304 A.3d at 927 (citing *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *2 (Del. Ch. June 27, 2019)). In both *Holifield* and *Absalom*, the act at issue was a transfer of interest in contravention to the applicable operating agreement, which was perpetrated by a member of the company, not the LLC. *Holifield*, 304 A.3d at 900 ("The issue in this litigation is whether Holifield validly transferred his limited liability membership units in XRI to Blue on June 6, 2018."); *Absalom*, 2019 WL 2655787, at *4 (addressing a member's transfer of an LLC interest in violation of an anti-transfer provision).

42

not HoldCo, tried to amend the HoldCo Agreement without HREF.[197]  That member act cannot be ratified.[198]

Even if ratification were available, Defendants did not prove HREF ratified the MStar Amendment through the First Amendment to HoldCo Agreement. "Ratification may be either express or implied through a party's conduct, but it is always a 'voluntary and positive act.'"[199]  "Knowledge, actual or imputed, of all material facts is an essential" element of ratification and the requisite knowledge may be implied through conduct or expressed by words.[200]  HREF's principal saw the MStar Amendment for the first time at his deposition in this matter.[201] Defendants offered no evidence HREF had knowledge "of all material facts" of the MStar Amendment—specifically the HUD approval requirements—when it

---

[197] MStar Amendment at 3–5; *Zohar III Ltd. v. Stila Styles, LLC*, 2022 WL 1744003, at *15 (Del. Ch. May 31, 2022) (holding an amendment to an LLC operating agreement purportedly adopted by a manager was an act by the manager, not the company), *aff'd sub nom. Tilton v. Zohar III Ltd., Inc.,* 285 A.3d 1204 (Del. 2022).

[198] *Holifield*, 304 A.3d at 927; *Absalom*, 2019 WL 2655787, at *2.

[199] *Genger*, 26 A.3d at 195 (quoting *Frank v. Wilson & Co.*, 32 A.2d 277, 305 (Del. 1943)); s*ee Manti Hldgs. LLC,* 261 A.3d at 1210 (Del. 2021) ("Under Delaware law, '[w]aiver is the intentional relinquishment of a known right.'" (quoting *Minna v. Energy Coal S.p.A.*, 984 A.2d 1210, 1214 (Del. 2009))); *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975) ("Intention forms the foundation of the doctrine of waiver and it must clearly appear from the evidence.").

[200] *Frank*, 32 A.2d at 305; *Manti Hldgs., LLC*, 261 A.3d at 1210–11 (Del. 2021) ("A waiver may be either express or implied, but either way, it must be unequivocal.") (quoting *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009)).

[201] Carroll Dep. at 197 ("I believe this is the first time I've seen this document . . . we clearly were not consulted on it.").

executed the First Amendment to HoldCo Agreement.[202] Defendants failed to prove by a preponderance of the evidence HREF ratified the MStar Amendment or its HUD approval requirements in executing the First Amendment to HoldCo Agreement.[203]

## B. The HUD Documents Do Not Inform Selection Of HoldCo's Manager.

Defendants then look beyond the HoldCo Agreement for HUD preapproval requirements.[204] First, they look to the HUD Documents.[205]

But again, per Section 18-402, only the HoldCo Agreement can speak to the manner of choosing HoldCo's manager.[206] The HoldCo Agreement as modified by

---

[202] *Frank*, 32 A.2d at 305; *Zohar III Ltd.*, 2022 WL 1744003, at *14 n.129 (declining to find waiver when "[t]here is absolutely no evidence that [plaintiff] intended to waive its right" when the manager purported to amend the LLC agreement in depravation of plaintiff's consent right).

[203] *Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *11 (Del. Ch. June 8, 2020) ("Ratification of an unauthorized act may be found from conduct which can be rationally explained only if there were an election to treat a supposedly unauthorized act as in fact authorized.") (quoting *Genger*, 26 A.3d at 195); *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *10 (Del. Ch. Jan. 30, 2015) (finding a defective corporate act ratified through "formal ratification" and contemporaneous evidence the parties acted as is the corporate act with authorized), *aff'd sub nom. In re Numoda Corp.,* 128 A.3d 991 (Del. 2015) (TABLE).

Defendants also argue since the MStar Amendment named MStar as a co-manager of HoldCo, HREF is barred from immediately acting as "sole manager" of HoldCo. DOB 17–18. Even if the MStar Amendment's terms were ratified, the HREF Amendment is clear: HoldCo would displace both co-managers as "sole manager." HREF Addendum § 3(ii)(b).

[204] DOB 14, 17; DR 18–19.

[205] *E.g.*, Borrower Agreement §§ 34, 46.

44

the HREF Addendum specifies the manner of choosing HoldCo's manager if HREF goes unpaid.[207]

And per Section 18-402, management is "vested" in the manager chosen by the process in the operating agreement.[208] "Vested" means "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute."[209] So once a manager is chosen as specified in the HREF Addendum, that manager holds managerial authority.[210] The Act provides that the process for choosing a manager must come from the operating agreement, and managerial authority vests upon performing that process: it definitionally does so

---

[206] 6 *Del. C*. § 18-402 ("[I]f a limited liability company agreement provides for the management, in whole or in part, of a limited liability company by a manager, the management of the limited liability company, to the extent so provided, shall be vested in the manager who shall be chosen in the manner provided in the limited liability company agreement."); 6 *Del. C*. § 18-101(12) (defining "manager" to be a person named "or designated as a manager of a limited liability company pursuant to, a limited liability company agreement"); Symonds & O'Toole, *supra* note 161, § 4.01[C], at 4-13 ("The limited liability company agreement [] serves as the primary source of organization for the entity; it governs relationships between and among the company, its members. . . .").

[207] HREF Addendum §§ 3(ii)–3(ii)(b).

[208] 6 *Del. C*. § 18-402.

[209] *Vested*, Black's Law Dictionary (12th ed. 2024); *see also Branin v. Stein Roe Inv. Couns., LLC*, 2014 WL 2961084, at *10 (Del. Ch. June 30, 2014) (explaining a "vested right [] cannot be unilaterally terminated").

[210] Symonds & O'Toole, *supra* note 161, § 9.01[B][2], at 9-11 ("The [Act] specifically authorizes terms in the liability company agreement providing for management of the company . . . by one or more managers. In such a case, management of the limited liability company is vested, to the extent so provided, in those designated persons.").

notwithstanding obligations in other contracts to third parties.[211] OpCo might have promised HUD to seek preapproval before the manager of its manager was replaced.[212] But OpCo's promise, and any consequences of its breach, is irrelevant to how HoldCo's manager is actually changed. The HUD Documents have no effect on HREF's right in the HoldCo Agreement to become HoldCo's manager upon an ARE, and do not interrupt vesting of HREF's managerial authority.

There is more. Defendants have shown no reason why OpCo's agreements with HUD should bind or restrict HREF or HoldCo.[213] "It is well established in Delaware that only parties to a contract may be liable for breach of that particular contract."[214] A contract "is an attempt by market participants to allocate risks and opportunities" and the role of the Court "is not to redistribute these risks and

---

[211] *Javice v. JPMorgan Chase Bank, N.A.*, 2023 WL 4561017, at *2 (Del. Ch. July 13, 2023) ("[C]ontracting parties may not unilaterally eliminate vested rights of third parties."); *Salaman v. Nat'l Media Corp.*, 1992 WL 808095, at *6 (Del. Super. Oct. 8, 1992) (holding "a vested contract right [] cannot be unilaterally terminated").

[212] The HREF Addendum recognizes there might be work to do with HUD once HREF exercised its step-in rights: HoldCo's members must "use best efforts to modify applicable HUD forms" upon the occurrence of an ARE. HREF Addendum § 3(ii)(a); *see also* JX 39 (HREF informing Defendants of an ARE and requesting Defendants' cooperate to effectuate a transition of managerial authority).

[213] *See* 13 *Williston on Contracts* § 37.1 (4th ed. 2025) ("The mere fact of entering into a contract gives rise to a relationship between or among the contracting parties known as "privity." . . . [And, generally,] only parties in privity of contract [can] sue on the contract." (internal footnote omitted)).

[214] *B&B Fin. Servs., LLC v. RFGV Festivals, LLC*, 2019 WL 5849770, at *3 (Del. Super. Nov. 7, 2019); *see Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) ("[B]asic contract principles [recognize] that a person not a party to [a] contract cannot be held liable to it.").

opportunities as [it sees] fit, but to enforce the allocation the parties have agreed upon."[215]  Under Delaware law, "'only parties to a contract are bound by that contract.'"[216]

Defendants' argument asks this Court to impose the HUD Documents' preapproval requirements on HoldCo and HREF—two strangers to those contracts between OpCo and HUD.[217]  Neither is a party to the HUD Documents, so neither is bound by their terms or obligations.  To be sure, the Borrower Agreement requires OpCo, as borrower, to receive HUD's written approval before changing the HUD-designated contact or amending its organizational documents.[218]  But that approval right does not bind HREF, so it does not bar HREF from exercising its ARE rights and immediately becoming HoldCo's sole manager.

---

[215] 11 *Williston on Contracts* § 31.5 (4th ed. 2025) ("While the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding … the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make. A court will not rewrite the contract of the parties.") (internal footnotes omitted).

[216] *Strougo v. Hollander*, 111 A.3d 590, 597 (Del. Ch. 2015) (quoting *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003)); *Strougo*, 111 A.3d at 592 ("I conclude based on principles of contract law that the Bylaw does not apply to this case because … [the] changes made to the Company's bylaws after the plaintiff was cashed out are not binding on him for the same reason that a non-party to a contract is not bound by the terms of that contract."); *Am. Legacy Found.*, 831 A.2d at 343 ("There is no doubt that a fundamental principal of contract law provides that only parties to a contract are bound by that contract."); *see, e.g.*, *Wallace v. Wood,* 752 A.2d 1175, 1180 (Del. Ch. 1999); *EEOC v. Waffle House, Inc.,* 534 U.S. 279, (2002) ("It goes without saying that a contract cannot bind a nonparty.").

[217] *See, e.g.*, DOB 2–3, 16–17; RB 17.

## C. The HREF Addendum Is Not Illegal.

Finally, Defendants look to HUD rules and regulations to argue the HREF Addendum in its entirety is "illegal and [] unenforceable," because it "required [OpCo] to make distributions to pay HREF's [Monthly Return] beginning in February 2020 and for each month thereafter."[219] Defendants contend 24 C.F.R. § 232.254, as reflected in the HUD Documents and the HUD Financial Operations and Accounting Procedures for Insured Handbook, prohibited OpCo from funding the Monthly Return.[220] That regulation requires that prior to making "distributions of mortgaged property … [the] borrower must demonstrate positive surplus cash[.]"[221] Defendants assert the HREF Addendum compelled monthly payments irrespective of whether a positive cash surplus had been demonstrated.[222] From there, Defendants conclude the HREF Addendum was illegal from the outset and is unenforceable as a matter of law.[223]

---

[218] Borrower Agreement §§ 34(a)–(i).

[219] RB 19.

[220] DOB 14, 17–20; RB 22–24; Trial Tr. 39–40, 90–96, 151–153; Borrower Agreement § 16. At trial, Defendants' counsel struggled to identify a specific statute that was being violated and to identify which payments allegedly violated the HUD requirements. Trial Tr. 86–90, 103–104. Defendants argued 24 C.F.R. § 232.254 prohibited the Monthly Return payments to HREF and therefore the HREF Addendum is illegal and unenforceable. Trial Tr. 90–92, 106–109.

[221] 24 C.F.R. § 232.254.

[222] DR 23.

[223] *Id*. at 3.

"Illegality is an affirmative defense on which Defendants bear the burden of proof."[224] Delaware courts may find a contract unenforceable if it is "illegal *per se* or violative of public policy."[225] "[C]ontracts that offend public policy are void."[226] As the Delaware Supreme Court explained:

> Under Delaware law, it is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law. Ordinarily, we think, when such is the fact, neither party has a remedy to any extent against the other. Moreover, this Court has held that a court may never enforce agreements void *ab initio*, no matter what the intentions of the parties. Thus, when an agreement is void *ab initio* as against public policy, the courts typically will not enforce a remedy to any extent against either party. In other words, the courts typically will leave the parties where they find them.[227]

Delaware courts will not aid in the enforcement of an illegal contract.[228]

At the same time, our courts "hold freedom of contract in high—some might say, reverential—regard. Only 'a strong showing that dishonoring [a] contract is required to vindicate a public policy interest even stronger than freedom of

---

[224] *Lighthouse Behav. Health Sols., LLC v. Milestone Addiction Counseling, LLC*, 2023 WL 3486671, at *10 (Del. Ch. May 17, 2023); *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2023 WL 4857281, at *7 (Del. Ch. July 31, 2023), *aff'd sub nom. Mobile Invs., LLC v. Tygon Peak Cap. Mgmt., LLC*, 315 A.3d 445 (Del. 2024); Ct. Ch. R. 8(c).

[225] *Bunting v. Citizens Fin. Grp., Inc.*, 2007 WL 2122137, at *5 (Del. Super. June 29, 2007).

[226] *U.S. Bank Nat'l Ass'n v. Stevens Tr. of Heather Michele Stevens Tr.*, 2025 WL 1139329, at *7 (Del. Super. Apr. 17, 2025); *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011).

[227] *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) (internal citations omitted).

[228] *Lynch*, 2020 WL 4381604, at *44.

contract' will induce our courts to ignore unambiguous contractual undertakings."[229] "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement[.]"[230] "[C]ourts are averse to voiding agreements on public policy grounds unless their illegality is clear and certain" and Delaware courts exercise "this authority with caution, an only in cases that are free from doubt."[231]

Delaware has recognized a contract that "violates the explicit mandate of a statutory provision" is *per se* illegal.[232] In determining whether a contract violative of a statute should be unenforceable as a matter of public policy, the Court must consider

> the statute's language, nature, object, purpose, subject matter, reach, the wrong or evil which the law seeks to remedy or prevent, the class of persons sought to be controlled, the legislative history and the effects of holding a contract in violation of the law invalid as well as

---

[229] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676–77 (Del. 2024) (quoting *ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.3 (Del. 2014), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006)); *see Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015) ("This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements; where Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits.").

[230] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 556 (Del. Ch. 2023).

[231] *Bennett v. Lally*, 2014 WL 4674623, at *4 (Del. Ch. Sept. 5, 2014) (quoting *Sann v. Renal Care Centers Corp.*, 1995 WL 161458, at *5 (Del. Super. Mar. 28, 1995)).

[232] *Preferred Fin. Servs., Inc. v. A & R Bail Bonds LLC*, 2019 WL 315331, at *5 (Del. Super. Jan. 23, 2019), *aff'd,* 217 A.3d 60 (Del. 2019).

balancing the interest in enforcement of the contract against the law's underlying public policy.[233]

And if only one provision within a contract is illegal, the analysis considers materiality and severability before deciding whether the plaintiff may still prevail on its claim.[234]

Defendants' argument fails at the threshold. Defendants contend the HREF Addendum is illegal because it required OpCo "to make distributions" to pay HREF: distributions governed by 24 C.F.R. § 232.254.[235] But the HREF Addendum did not require distributions from OpCo at all or in violation of the regulation.[236] The HREF Addendum required HoldCo to pay the HREF Monthly

---

[233] *Bunting*, 2007 WL 2122137, at *5 (citing *Bank of Baltimore v. Auto's Plus*, 1994 WL 19937, *2 (Del. Super. Jan. 4, 1994)); *Preferred Fin. Servs., Inc.*, 2019 WL 315331, at *5 (identifying the same factors); *Lighthouse Behav. Health Sols., LLC*, 2023 WL 3486671, at *10 (accord).

[234] *Lighthouse Behav. Health Sols., LLC*, 2023 WL 3486671, at *11 (collecting authorities).

[235] Trial Tr. 151–54; 24 C.F.R. § 232.254 ("Borrower may make and take distributions of mortgaged property, as set forth in the mortgage loan transactional documents, to the extent and as permitted by the law of the applicable jurisdiction, provided that, upon each calculation of borrower surplus cash (as defined by HUD), which calculation shall be made no less frequently than semi-annually, borrower must demonstrate positive surplus cash, or to the extent surplus cash is negative, repay any distributions taken during such calculation period within 30 calendar days unless a longer time period is approved by HUD . . . .").

[236] HREF Addendum § 4(iii); Collateral Assignment, Pledge, and Security Agreement §§ 4–5; Security Agreement § 1 ("The [Pledged Account] means the deposit account maintained by [HoldCo] ...."); BACA. § 2 ("[HoldCo] represents and warrants that it has the legal right to pledge the [Pledged] Account to [HREF], that the funds in the Deposit Account are not held for the benefit of a third party" and "[HoldCo] covenants with [HREF] that it shall not enter into any acknowledgment or agreement that gives any other

Return payments from the Pledged Account—"a segregated account in the name of the Company"—that "may only be drawn on by [HREF] when amounts under this Addendum are due and payable to HREF[.]"[237] The contract required the funds to come from an account in HoldCo's name.[238] Putting the Pledged Account under OpCo's name was a mistake in performing the contract, not a term of the contract that could possibly make the contract itself illegal. And the HREF Monthly Return Fund fully funded HoldCo's first twenty-five payments of the HREF Monthly Return.[239]

After the HREF funds ran dry, the OpCo Agreement—not the HREF Addendum—required OpCo to fund HoldCo's payments to HREF.[240] The OpCo Agreement states that "[f]rom time-to-time and before any distribution of Net Cash Flow . . . [OpCo] shall make payments to, or on behalf of, [HoldCo] sufficient to allow [HoldCo] to timely make required payments to [HREF] pursuant to the terms of the [HoldCo] Agreement, including monthly payments of the [HREF] Current

---

person or entity except [HREF] control over, or any other security interest, lien or title in, the [Pledged] Account.").

[237] HREF Addendum § 4(iii); *see* Security Agreement at Recital ("[T]he Additional Amount [] will be used to fund Project related fees, expenses and amounts due to [HREF], as more fully set forth in the Addendum.").

[238] HREF Addendum § 4(iii); Security Agreement § 1; *see generally* BACA.

[239] HREF Addendum § 4(iii); Trial Tr. 15, 68, 123–24,135–36; Carroll Dep. at 14–15; see BACA ¶¶ 1–2.

[240] Trial Tr. 15–17; OpCo Agreement § 9.1.

Return[.]"[241] Defendants contend this language required OpCo to make "distributions" to fund HREF payments even when OpCo should not have under 24 C.F.R. § 232.254.[242]

It does not. It simply provides that OpCo would pay HREF before making any other distributions.[243] OpCo was not required to fund HREF's Monthly Returns no matter what.[244] Indeed, Section 16 of the Borrower Agreement prevents distributions "from borrowed funds" or when the Project is cash flow negative.[245] OpCo could refrain from making distributions and suffer the consequences, like an ARE that gave HREF control.[246] Instead, Lindsey sought to maintain control by causing LindseyCo to loan OpCo money after the Pledged Account ran dry.[247] Defendants failed to establish clear and certain illegality in OpCo's obligations to pay HREF, which are not even in the HREF Addendum.

---

[241] OpCo Agreement § 9.1.

[242] DR 22; DR 24. Defendants claim an affidavit submitted by HREF's principal as part of litigation in Texas relating to the Project establishes the HREF Addendum is illegal. Trial Tr. 104, 125–26; s*ee* JX 45 ¶¶ 8–11. Not so. The pertinent portion of that affidavit tracks the language of Section 9.1 of the OpCo Agreement, which as discussed above did not require OpCo to remit payments to HREF in violation of HUD rules or regulations. *Compare* JX 45 ¶ 9 *with* OpCo Agreement § 9.1.

[243] OpCo Agreement § 9.1.

[244] Trial Tr. 154–156.

[245] Borrower Agreement § 16.

[246] *See* PB 18.

[247] Trial Tr. 123–125, 138, 149–151; JX 23 at 1; JX 28 at 1–2.

Defendants also assert the HREF Addendum in its entirety is illegal because HREF's right to step in as HoldCo's manager effectively eliminated HUD's approval right.[248] Defendants posit the HREF Addendum circumvents HUD's approval right in the HUD Documents because (i) the HUD Documents provide HUD with a consent right over managerial changes in "the organizational documents of Borrower;"[249] (ii) OpCo executed the HUD Documents before the HREF Addendum; (iii) HUD did not approve the HREF Addendum; and (iv) the HREF Addendum provides that upon the occurrence of an ARE, HREF becomes HoldCo's sole manager.[250]

HREF's exercise of the step-in rights it contractually secured from HoldCo might put OpCo in hot water in its contract with HUD.[251] But that does not make HREF's contract with HoldCo "illegal *per se* or violat[ive] [of] public policy."[252] The HREF Addendum anticipated smoothing things over with HUD: "[u]pon the occurrence of an ARE . . . the Project Managers shall use best efforts to modify applicable HUD forms and any other relevant forms, and shall otherwise use best

---

[248] Trial Tr. 105–106.

[249] Borrower Agreement § 34(i).

[250] RB 17–18; DOB 18–19; Trial Tr. 105–106.

[251] *See MetCap Secs. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *6 n. 49 (Del. Ch. May 16, 2007).

[252] *Bunting v. Citizens Fin. Grp., Inc*., No. CIV.A. 05C-03-013ESB, 2007 WL 2122137 (Del. Super. June 29, 2007).

efforts to take all other steps necessary, to provide that [HREF] . . . replace[s] the Project Managers as sole manager of the Company . . . .[253]  And at worst, HREF stepping in would cause OpCo to breach a contract with HUD:  neither HREF nor OpCo would have done anything illegal.  And even if they had, Defendants have not attempted to show HREF's step-in rights should be unenforceable as a matter of public policy.[254]  Defendants have failed to preclude enforcement of HREF's step-in rights.

**D. The Proper Parties are Before the Proper Venue to Resolve HREF's Claim Under Section 18-110.**

In a last-ditch effort, Defendants cast about for missing parties and a different venue.  Defendants assert HREF's 18-110 claim "arises under or in relation to the HUD [Loan Documents]" and the contracts between OpCo and HUD require HUD, Greystone, MStar as a purported co-manager, MStar's principal Robert A. Sweet, and the Project's property manager, Meridian Senior Living, LLC, to be joined as parties to this action.[255]

HREF's Section 18-110 claim is a claim *in rem*.  Section 18-110 requires only that "the limited liability company shall be named as a party."[256]  Only the

---

[253] HREF Addendum § 3(ii)(a).

[254] *Lighthouse Behav. Health Sols., LLC*, 2023 WL 3486671, at *10 (collecting authorities).

[255] DOB 3.

[256] 6 *Del. C.* § 18-110(a).

entity itself appears before the Court in its "individual" capacity because the entity embodies the *res*.[257] Other parties to an *in rem* proceeding appear "not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever be barred from doing so."[258]

HoldCo's purported managers need not be made parties: they need only be provided adequate notice of the pendency of Plaintiff's claim.[259] "Because a Section 18-110 proceeding affects the Delaware LLC and the office of managing member, it is not necessary for all claimants to the office to be subject to the Court's *in personam* jurisdiction in order for the Court to make an authoritative determination."[260] This Court has the "constitutional authority" to determine HoldCo's managing member once "persons with potential claims to the [office] in question . . . receive adequate notice and an opportunity to be heard."[261] While claimants to the *res* are entitled to "notice and an opportunity to be heard," they need not be made parties to the proceeding.[262]

---

[257] *Genger*, 26 A.3d at 220.

[258] *Id.* at 199–220.

[259] 6 *Del. C.* § 18-110(a).

[260] *Feeley*, 2012 WL 966944, at *5.

[261] *Cedar Lane Farms, Inc.*, 1992 WL 111210, at *3; *Feeley*, 2012 WL 966944, at *5; *McMillan*, 2024 WL 3311812, at *5; *Haft*, 1996 WL 255899, at *2; *see Mullane*, 339 U.S. at 314.

[262] *Haft*, 1996 WL 255899, at *2; *Feeley*, 2012 WL 966944, at *5.

As for Greystone and HUD, they hold only a consent right. They, Sweet, and Meridian have no claim to the contested *res*. They lack even the interest that compels adequate notice.[263]

Finally, Defendants argue Count V is "procedurally defective" because the Note requires any controversy arising under it to be brought in Texas, the location of the Project.[264] The "Borrower agree[d]" to litigate any "controversy arising under or in relation to th[e] Note" in Texas.[265] The Note explicitly defined "Borrower" to refer to OpCo.[266] Neither HoldCo nor Plaintiff is a party to the Note with HUD, or bound by its forum selection clause. And this is not a controversy under OpCo's Note with HUD. This is a controversy under the HoldCo Agreement amended by the HREF Addendum. The Amended Complaint seeks to vindicate Plaintiff's right under the HoldCo Agreement amended by the HREF Addendum: Count V relates to HoldCo's internal affairs and is properly adjudicated by this Court.[267]

\* \* \* \* \*

---

[263] *See* Restatement (Second) of Judgments § 6 (1982) ("The concept of *in rem* jurisdiction presupposes the existence of a legal relationship that is conceived of as property.").

[264] DOB 9; *see* JX 8 §§ 16(a)–16(b).

[265] Note § 16.

[266] *See generally* Note.

[267] *Cornerstone*, 2003 WL 1787959, at \*13 ("[T]his state has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws.").

HREF became HoldCo's sole manager when its ARE step-in right was undisputedly triggered. Nothing in the HoldCo Agreement disturbs that conclusion, and nothing outside it can. Judgment on Count V shall be entered accordingly.

## E. HREF's Request For Specific Performance

HREF additionally seeks relief from this Court in the form of an order requiring Defendants to comply with the "best efforts" provision under the HREF Addendum.[268] The HREF Addendum provides in relevant part:

> "[u]pon the occurrence of an ARE … (a) the Project Managers shall use best efforts to modify applicable HUD forms and any other relevant forms, and shall otherwise use best efforts to take all other steps necessary, to provide that [HREF] or its designee shall be a key principal thereunder and to cause [HREF] or its designee to replace the Project Managers as sole manager of the Company with all decision making authority of the Company as the manager of the [OpCo]. Without limiting any other provision of this Addendum, the Sponsor Members agree that they shall execute such additional documents as [HREF] may request in order to facilitate the foregoing provisions (including, without limitation, a power of attorney).[269]

In a Section 18-110 action, Delaware law counsels against doing more than what is necessary to determine who holds the disputed office. Some requests for relief may exceed the Court's ancillary authority.[270] Others may require personal

---

[268] Joint Stip. ¶ 45.

[269] HREF Addendum § 3(ii)(a) (emphasis added).

[270] *Lynch*, 2020 WL 3422399, at *5 ("A Section 18-110 proceeding is 'designed to focus with precision on the corporate interest in prompt resolution of grievances respecting claims to office.'" (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and*

jurisdiction that the Court does not have in an *in rem* action.[271]  In this case,

HREF's Section 18-110 claim is but one claim in a sprawling plenary action.

HREF has secured personal jurisdiction over Defendants.  There is another reason

to deny relief at this time:  ripeness.

"There must be an actual controversy present for the court to exercise

declaratory judgment jurisdiction."[272]  Where an actual controversy is lacking the

Court "[t]he ripeness doctrine prevents Delaware courts from exercising

---

*Commercial Practice in the Delaware Court of Chancery* § 9.09[b], at 9-201 to -02 (2018))); *Zohar III Ltd.*, 2022 WL 1744003, at *10 ("[T]he test for determining whether a claim can properly be decided under § 18-110 is 'whether it is necessary to decide [the claim] in order to determine the validity of the election or designation by which the defendant claims to hold office.'" (quoting *Kahn Bros. & Co. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov. 15, 1988)).  If the resolution of a claim is not necessary to determine an LLC's proper manager, "those claims 'are said to be collateral to the purpose of a [Section 18-110] action and must be raised in a [separate] plenary action.'" *Genger*, 26 A.3d at 199 (quoting *Agranoff v. Miller,* 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999)).  Section 18-110 "does not address … what is required [] of former managers who have been properly removed"—such relief exceeds the scope of this narrow statutory proceeding. *Avgiris Bros., LLC v. Bouikidis*, 2022 WL 4672075, at *16 (Del. Ch. Sept. 30, 2022).

[271] *In re Doehler Dry Ingredient Sols., LLC*, 2022 WL 4281841, at *4 (Del. Ch. Sept. 15, 2022) (explaining that where a plaintiff seeks "specific performance of a contract, even where it relates to property [the claim] is in personam insofar as it [] s[eeks] to compel performance by the defendant"), *aff'd sub nom. In re Dissolution of Doehler Dry Ingredient Sols., LLC*, 294 A.3d 64 (Del. 2023) (TABLE); *Genger*, 26 A.3d at 199 (explaining proceeding *in rem* "'imposes important limits on the scope of [a] court's remedial powers even as to claims bearing on whether a person lawfully holds corporate office'" (quoting *Agranoff,* 1999 WL 219650, at *18)); *Lynch*, 2020 WL 3422399, at *5 (explaining the Court "cannot go further and actually rescind a transaction, award money damages, or otherwise fashion a remedy that is binding on individuals or entities beyond the res, unless the Court has in personam jurisdiction that would allow it to fashion that type of ultimate relief and bind those individuals or entities") (internal quotations omitted).

jurisdiction over [such] disputes" because "doing so would result in the rendering of an advisory or hypothetical opinion."[273] "[I]f the mere threat of future breach or disregard of court orders triggered equitable jurisdiction, such jurisdiction would be general, not limited," and guidance from the Court in such a situation would be too attenuated from an existing dispute to satisfy the ripeness doctrine.[274]

An order from this Court declaring the proper manager of HoldCo "changes the incentives of the parties to the contract. . . . The fact that a breaching party theoretically may re-breach" does not establish a live controversy.[275] "Any future breach following a court's ruling would be hypothetical, such that instructing [Defendants] to 'go, and breach no more' would be 'entirely unnecessary' and thus inappropriate."[276]

HREF has prevailed in establishing it is HoldCo's proper manager and that the HREF Addendum is binding on HoldCo and its members. Defendants are bound by this Court's order, and the HREF Addendum. I expect they will comply with both. Having not yet been shown they failed to comply, it is premature to

---

[272] *Cardinale v. Feingold*, 2023 WL 142510, at *2 (Del. Ch. Jan. 10, 2023).

[273] *Solak v. Sarowitz*, 153 A.3d 729, 736 (Del. Ch. 2016).

[274] *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376, at *8 (Del. Ch. July 31, 2019).

[275] *Id.*

[276] *All. Compressors LLC v. Lennox Indus. Inc.,* 2020 WL 57897, at *5 (Del. Ch. Jan. 6, 2020).

compel them to do so. HREF's request for an order compelling Defendants to comply with Section 3(ii)(a) is denied without prejudice.

## F. HREF's Request for Attorney's Fees

"Delaware follows the 'American Rule,' whereby a prevailing party is generally expected to pay its own attorney's fees and costs."[277] "Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees."[278] While this Court has the discretion to shift fees if appropriate, "the American Rule remains the default."[279]

At this point HREF's request for attorneys' fees is premature.[280] The parties to this action still have five pending claims that remain to be adjudicated, and the

[277] *Montgomery Cellular Hldg. Co., Inc. v. Dobler,* 880 A.2d 206, 227 (Del. 2005).

[278] *Avgiris Bros.,* 2023 WL 7137104, at *2.

[279] *Star Am. Rail HoldCo, LLC v. Cathcart*, 2024 WL 5239938, at *10 (Del. Ch. Dec. 17, 2024); *Montgomery Cellular Hldg. Co., Inc. v. Dobler,* 880 A.2d 206, 227 (Del. 2005) ("Delaware follows the 'American Rule,' whereby a prevailing party is generally expected to pay its own attorney's fees and costs.").

[280] HREF did not brief its request for fees in its opening brief; HREF briefed its request for attorneys' fees for the first time in its sur-reply. SR 9–10 (dedicating a mere 10 lines of text to its request for fees). But for there being more to do in this case, it would have been waived. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (deeming a party to have waived arguments that it did not present in its opening post-trial brief); *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012) (finding an argument "first raised in a pretrial brief" to be waived); *see Gans v. MDR Liquidating Corp.*, 1993 WL 193526, at *1 (Del. Ch. May 28, 1993) ("applications for attorney fees are often rejected if the litigation has not been completed").

outcome could alter the analysis of whether to deviate from the default American Rule. Accordingly, HREF's request for fees is held in abeyance pending the resolution of the remaining claims.

## III. CONCLUSION

Judgment on Count V shall be entered in HREF's favor. HREF is entitled to immediately become HoldCo's sole manager. The parties shall submit an implementing order.